IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

RONALD SCHMIDT

                  Plaintiff,                        OPINION AND ORDER

    v.

                                                    20-cv-999-wmc

HANDS ON CDL DRIVING
SCHOOL, INC.,

                  Defendant.

      In this case, Ronald Schmidt claims that Hands On CDL Driving School, Inc., fired him in retaliation for his engaging in protected activity under the Fair Labor Standards Act, 29 U.S.C. §§ 201-209.  More specifically, Schmidt claims he was fired in retaliation for complaining about Hands On's refusal to pay him overtime hours.  In competing motions, Hands On seeks summary judgment on liability and plaintiff seeks partial summary judgment on the defense of after-acquired evidence.  (Dkt. ##15, 21.)  For the reasons set forth below, although a very close decision, the court will deny both motions, meaning this matter will proceed to a jury trial on March 21, 2022.

UNDISPUTED FACTS

**A. Hiring**

      Defendant Hands On is a small family-owned corporation in the business of training students to take the Commercial Drivers License ("CDL") test.  (Def.'s Reply to Def.'s PFOFs (dkt. #41) ¶¶ 1-2.)  While Hands On's main campus is in Holcombe, Wisconsin, after making a "handshake agreement" with Bill Rands, the owner of Rands Trucking, for use of his lot, Hands On opened a new training location in Chippewa Falls, Wisconsin.

(*Id*. ¶¶ 14-17.)

Hands On hired plaintiff Ronald Schmidt on March 23, 2020, as the first and only trainer assigned to the Chippewa Falls location. (*Id*. ¶¶ 18-19.) His hiring was so prompt that Schmidt did not even fill out a job application for Hands On until a week after his hiring. (*Id*. ¶ 14.) In ultimately filling out his application, however, Schmidt indicated that he left Chippewa Valley Technical College because of a lack of work, which was at best less than the complete story. (*Id*. ¶ 15.) Certainly, Schmidt *had* worked at Chippewa Valley Technical College as a part-time CDL trainer. (Pl.'s Rep. to Pl.'s PFOFs (dkt. 38) ¶ 7.) Moreover, Schmidt had asked several times to be assigned to a full-time position, which Chippewa Valley was unwilling to do. (*Id*. ¶ 8.) Instead, in 2018, Schmidt's supervisor scheduled him to work from July 11-14, at which point Schmidt advised he would not do so and failed to work those days as originally scheduled. (*Id*. ¶¶ 10-12.) As a result, Chippewa Valley Technical College informed Schmidt on July 18, 2018, that he had "voluntarily terminated" his part-time position due to job abandonment. (*Id*. ¶ 12.)

B. **Overtime Dispute**

After this incomplete disclosure (unknown to Hands On at the time), Schmidt continued as an employee, and at the end of his first pay period as a Hands On employee, he recorded working more than 40 hours per week. (Def.'s Rep. to Pl.'s Resp. to Def.'s PFOF (dkt. #41). ¶¶ 31-33.) Because this ostensibly had never happened with other Hands On trainers, Schmidt's entitlement to time and a half pay for hours in excess of the first 40 was brought to Hands On's Office Manager, Brooke Smith. While the parties dispute what Smith told Schmidt about his recorded hours, both sides agree that Schmidt

2

was not paid time-and-a-half for his overtime hours in his check for the first pay period, and it appears he may not have been fully reimbursed for his overtime hours until the final paycheck was issued after his firing. (*Id.* ¶ 33.) In addition to claiming that Smith disputed his right to overtime pay, Schmidt also claims that Julie Gilbertson, the wife of Hands On's owner Paul Gilbertson, told him that he would not get any overtime pay. (*Id.* ¶ 40.) In contrast, defendant maintains that Smith rearranged his schedule, so that all of his duties could be completed within 40 hours per week, effectively removing the need for him to work further overtime, and agreed to review his right to be paid overtime for the excess hours he claimed to have worked. (*Id.* ¶¶ 42-46.)

### C. Complaints about Schmidt

During his two months working for Hands On, several students complained about Schmidt's training, saying that he was too "rough." (*Id.* ¶¶ 49-59.) Officer Manager Smith further attests to having relayed student complaints to him. (*Id.* ¶¶ 82-83.)[1] While Schmidt does not recall being told about the student complaints, he also does not dispute being told about them

In addition, in the spring of 2020, Bill Dekarske, a third-party commercial driving license tester, spoke to Jason Weggen, who worked as the terminal manager for Rand's Trucking and often interacted with Schmidt. (*Id.* ¶¶ 66-68.) According to Smith, Dekarske reported Weggen's complaints about Schmidt's conduct at the site, noting that his students

---

[1] Plaintiff objects to all of these reported complaints as inadmissible hearsay, but defendant is generally right that they are properly considered not for their truth, but proof of what information was being relayed to Hands On about Schmidt's performance, which goes to defendant's motivations for firing him.

were driving the wrong way, grinding gears and using the Rand's Trucking bathroom.  (*Id*. ¶ 69, 94.)  Weggen testified that Schmidt would also complain to him about not getting overtime pay from Hands On.  (Weggen Dep. (dkt. #14) 9:15-18.)  According to Smith, Dekarske reported that Weggen asked him to speak with Hands On's owner Paul Gilbertson about his concerns, which Dekarske did.  (*Id*. ¶¶ 70-72.)  Gilbertson described understanding from that conversation that "[Weggen] told Bill [Dekarske] that [Schmidt] comes in constantly and he's sitting there complaining about not getting paid overtime." (Paul Gilbertson Dep. (dkt. #26) 38:3-5.)

Gilbertson himself then called Weggen, who repeated that Schmidt and his students were grinding gears, driving the wrong way, and using the Rand's Trucking bathroom.  (*Id*. ¶¶ 75-78.)  Weggen further told Gilbertson that he did not want Hands On using Rand's facility to train drivers until these things were remedied.  (*Id*. ¶ 80.)  To avoid upsetting anyone, Gilbertson then told Weggen that Hands On would no longer use Rand's facility. (*Id*. ¶ 81.)

D. Termination

On May 20, 2020, Office Manager Smith next met personally with Schmidt at the Rand's Trucking location and told him that he was fired.  (*Id*. ¶ 90.)  She also told Schmidt that he was being fired because the company lost the use of the training facility in Chippewa Falls and because he had slandered the company.  (*Id*. ¶¶ 93-94.)  While Schmidt was eventually paid any overtime owed him, the parties disagree whether he was paid in full before or after his firing.  As previously noted, and his last paycheck suggests he was not paid in full until shortly after his firing.  (*Id*. ¶¶ 99-100.)

4

OPINION

Summary judgment must be granted against a party who fails to make a showing sufficient to establish the existence of an element essential to a party's claims on which that party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If there is any genuine issue of material fact on the element, however, the court cannot grant summary judgment. *Id*. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). Finally, "[t]he evidence of the non-movant[s] is to be believed, and all justifiable inferences are to be drawn in [their] favor." *Id*. at 255.

## I. FLSA Retaliation

Hands On argues that Schmidt has failed to raise a genuine issue of material fact about whether his firing was retaliation for his complaints about a lack of overtime pay, warranting summary judgment in its favor. The FLSA expressly authorizes employees to bring suit against an employer who "discharge[s] or in any other manner discriminate[s] against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter." 29 U.S.C.A. § 215. "Under § 215(a)(3), [plaintiff] has the burden of demonstrating that [his employer] engaged in retaliatory conduct." *Kasten v. Saint-Gobain Performance Plastics Corp.*, 703 F.3d 966, 972 (7th Cir. 2012). Courts previously distinguished between direct and indirect evidence of retaliation, using slightly different standards with each. *Cichon v. Exelon Generation Co.*, 401 F.3d 803, 810 (7th Cir. 2005). However, the Seventh Circuit has explained that as a practical matter both direct and indirect evidence "belongs in a single

5

pile and must be evaluated as a whole." *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 766 (7th Cir. 2016). Accordingly, the question is "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's . . . proscribed factor caused the discharge or other adverse employment action." *Id*. at 765. This general inquiry can be boiled down to the requirements of a retaliation claim under the FLSA: a protected statement, adverse employment action, and causation between the two. *Id*. Courts may, but are not required, to look at circumstantial evidence like "(1) suspicious timing, ambiguous statements or behaviors; (2) evidence that similarly situated employees were treated differently; or (3) a pretextual reason for adverse employment action." *Kasten*, 703 F.3d at 973.

Both parties extensively debate what categories of circumstantial evidence are most persuasive, and defendant certainly appears to have the stronger evidence, but a court may not engage in such fine winnowing at summary judgment. As previously noted, plaintiff must show that a "proscribed factor caused [his] discharge or other adverse employment action." *Ortiz*, 834 F.3d at 766. Here, Schmidt has shown that he experienced an adverse employment action, as he was let go from the company only two months after his hiring. This leaves the other, two elements of protected expression and causation. The parties agree that Schmidt's verbal complaints about overtime pay to Smith and Paul Gilbertson were protected expression. *Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 14 (2011) (holding that both written and oral complaints are protected under the anti-retaliation provision of FLSA). While defendant makes a half-hearted argument that a complaint to Julie as a non-owner, as opposed to Paul Gilbertson, is somehow not

protected, or at least her claimed rejection of his claim to overtime is not attributable to the defendant, plaintiff's complaints to Smith and Paul Gilbertson are unquestionably protected statements.

Thus, defendant's motion for summary judgment turns on whether a reasonable jury could find these statements *caused* his firing. Defendant rightly stresses the roughly two-month delay in plaintiff's actual firing from his original complaint about overtime pay *and* the intervening problems reported in Schmidt's performance on the job, which ostensibly led to a decision to shut down the training location at Rand's Trucking in Chippewa Falls. Had there been definitive evidence that the overtime dispute had been resolved by the time of plaintiff's firing, these intervening events would likely be dispositive. Unfortunately for defendant, there is substantial evidence that a dispute over Schmidt's overtime complaint continued to fester throughout his employment and was not resolved until after his firing. In particular, in addition to the apparent final payment for overtime only coming in the form of his last paycheck after the firing, one of defendant's two stated grounds for firing Schmidt was that Schmidt slandered the company, with the only identified slanderous statement being his complaint about the defendant's refusal to pay overtime to an employee of Rands, Jason Weggen. Indeed, at summary judgment, Schmidt emphasizes that he complained about a lack of overtime pay to Smith, Gilbertson *and* Weggen at different times. (Pl.'s Opp.'n (dkt. #32) 6.) Schmidt originally asked Smith to correct his first paycheck to account for his overtime, and later complained to Paul and Julie Gilbertson when Smith would not do so. (Def.'s Reply to Def.'s PFOFs

7

(dkt. #41) ¶¶ 33, 41.) Finally, Schmidt complained to Weggen that he did not get the overtime owed him by Hands On. (*Id*. ¶ 94.)

Defendant argues that Schmidt never identified his alleged statements to Weggen as protected expression in his complaint, improperly raising the argument for the first time in his opposition to summary judgment. (Def.'s Reply (dkt. #47) 2-3.) This argument holds little water, as Schmidt's complaint to Weggen concerned the same dispute as to overtime that led to his earlier complaints to Smith and the Gilbertsons. Defendant was also aware of Schmidt's argument because it specifically noted his complaints and the calls between Weggen, Dekarske, and Paul Gilbertson before plaintiff filed his opposition. (Def.'s Opening Br. (dkt. #16) 12.) As such, defendant had fair notice of this argument. Regardless, the import of this communication is not so much whether it is an independent protected statement, but rather pretext for plaintiff's firing.

The harder question is whether Schmidt's complaints to Weggen about overtime constitute protected activity. The Supreme Court held that "[t]o fall within the scope of the antiretaliation provision, a complaint must be sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the statute and a call for their protection." *Kasten*, 563 U.S. at 14. "Defendant does not dispute that Plaintiff engaged in a protected activity when he asked about and/or complained about overtime hours" to Smith and Paul Gilbertson. (Def.'s Mot. (dkt. #16) 4.) However, defendant argues that plaintiff's complaint to Weggen did not have the sufficient degree of formality contemplated in *Kasten*.

8

Neither the parties nor the court have found any cases that have contemplated the specific question of complaints to third-parties, likely because most employers wouldn't hear about any of those outside complaints. Here, it is clear that Schmidt's complaints to Weggen were reported back to Hands On, providing a potential causal connection between the complaint and Schmidt's firing. (Paul Gilbertson Dep. (dkt. #26) 38:3-5.) Additionally, it appears that Schmidt was complaining to Weggen *about* his overtime dispute with Smith and Gilbertson, which both parties agree were protected activities. Finally, under Section 7 of the National Labor Relations Act, 29 U.S.C. §§ 151-166, employers may not interfere with an employee's right to complain about wages or other terms and conditions of employment, whether unionized or not. *Genesco, Inc. v. Joint Council 13, United Shoe Workers of Am., AFL-CIO,* 230 F. Supp. 923, 931 (S.D.N.Y. 1964), aff'd, 341 F.2d 482 (2d Cir. 1965) (citing *N.L.R.B. v. National Furniture Manufacturing Co.*, 315 F.2d 280, 284-285 (7th Cir. 1963) (holding that "disparagement of plaintiff, its business and its product describes other arguably protected activity.")

Ultimately, the holding in *Kasten* focused on whether "the recipient has been given fair notice that a grievance has been lodged and does, or should, reasonably understand the matter as part of its business concerns." 563 U.S. at 14. If Schmidt's complaint to Weggen was his only potential protected activity, this would be a much closer call; however, here we have continued dissatisfaction from Schmidt over a period of weeks, all starting from his admittedly protected statements to Smith and Gilbertson regarding the same issue. The statement to Weggen is just a continuation of those previous statements, with all the statements eventually getting back to Hands On. Breaking out plaintiff's statement

to Weggen as somehow legally distinct when it involved the same exact complaint based on the same alleged FLSA misconduct (at least according to plaintiff) and was known by Hands On like the other statements would create a distinction without a real difference. *Kasten* focuses on fair notice to employers, and a reasonable jury could certainly find that Hands On had fair notice of Schmidt's continued overtime dispute, which included his various statements to Smith, Gilbertson, *and* Weggen.

Again, therefore, this leaves the real question at summary judgment: whether there is a genuine dispute of material fact that any of these complaints *caused* plaintiff's firing. While the Seventh Circuit has not clearly outlined the causation standard for FLSA retaliation, district courts within the circuit have consistently applied a "but for" or "because of" standard. *Demers v. Cty. of Barron*, No. 18-CV-030-WMC, 2019 WL 2287980, at *11 (W.D. Wis. May 29, 2019) (citing *Poff v. Quick Pick*, LLC, No. 2:15-cv-00405-JMS-MJD, 2018 WL 6061569, at *4 (S.D. Ind. Nov. 20, 2018) (applying "but for" or "because of" standard to FLSA retaliation claim); *Head v. Prof'l Transp., Inc.*, No. No. 3:13–cv–00208–RLY–WGH, 2015 WL 5785797, at *4 (S.D. Ind. Sept. 30, 2015) (same).)

At the outset, *defendant* acknowledges that Schmidt was in part "being fired for slandering the company." (Def.'s Reply to Def.'s PFOFs (dkt. #41) ¶ 94.) While defendant dances around what kind of slander Schmidt specifically engaged in, the *only* negative statements it has identified are those about Hands On's failure to pay his overtime made to Weggen. Indeed, when speaking about the call from Bill Dekarske that led to Schmidt's firing, Hands On owner Paul Gilbertson describes his understanding that "[Weggen] told Bill [Dekarske] that [Schmidt] comes in constantly and he's sitting there

10

complaining about not getting paid overtime." (Paul Gilbertson Dep. (dkt. #26) 38:3-5.) Weggen also testified that the only complaint Schmidt made to him was "something about overtime . . . He said he didn't get it." (Weggen Dep. (dkt. #14) 9:15-18.) Indeed, Hands On does not identify *any other* slanderous statements from Schmidt, leaving the only reasonable inference that the slanderous statements Schmidt was fired for were those regarding his overtime. Given that defendant has all but acknowledged that Schmidt's complaints about overtime were one of only two, stated reasons for his firing, plaintiff has produced sufficient evidence, both circumstantial as to timing *and* direct as to the basis for plaintiff's firing, for a reasonable jury to find that he created a genuine dispute that but for his overtime complaints he would not have been fired.

In its defense, defendant persuasively argues that it would have fired Schmidt regardless of his overtime complaints due to the loss of the Chippewa Falls training facility and the student complaints against Schmidt. (Def.'s Rep. (dkt. #47) 2-3). Defendant could also argue that it wasn't the fact that Schmidt was complaining about overtime to Weggen that led to his firing, but rather his airing of the company's dirty laundry in a wholly inappropriate way.[2] These seem like plausible, alternative explanations that a reasonable jury might find compelling. However, the question of the *actual* motivating factor(s) in Schmidt's firing is a material dispute which cannot be decided at summary judgment.

---

[2] To date, however, the court is unaware of statements made by plaintiff to Weggen that would take it out of protected speech under Section 7. 29 U.S.C.A. § 157.

11

As the Seventh Circuit explained in *Stone v. City of Indianapolis Public Utilities Division*, 281 F.3d 640 (7th Cir. 2002), "if the plaintiff has produced evidence that he was fired because of his protected expression . . . The fact that the defendant may be able to produce evidence that the plaintiff was fired for a lawful reason just creates an issue of fact: what was the true cause of the discharge?" *Id.* at 643. Indeed, "some cases permit easy inferences, such as the fabled employer who admits to firing an employee because of race. But even then factfinders must ask themselves what the admission means." *Ortiz,* 834 F.3d at 765. While defendant's explanation about student complaints and the closure of the Chippewa Falls facility provides a potential, even powerful, lawful reason for Schmidt's firing, it does not allow that decision to be made at summary judgment.[3] For that reason, defendant's motion for summary judgment must be denied.

## II. After-Acquired Evidence Defense

Plaintiff also brought a motion for partial summary judgment, seeking to bar defendant's affirmative defense of after-acquired evidence. In employment discrimination claims, defendants may limit damages for backpay if they find evidence, even during after-the-fact discovery, which would have led to the employee's firing anyway. *McKennon v. Nashville Banner Pub*. Co., 513 U.S. 352, 361 (1995). In the course of discovery here, defendant found out that Schmidt had arguably lied on his job application, writing that he

---

[3] Even the argument that Weggen's complaints about plaintiff's operation of the training operation at Rand's was the reason that Paul Gilbertson chose to close down that operation is open to reasonable dispute since Weggen only asked for a temporary halt to operations. Certainly, though the jury *could* find that Gilbertson acted for a separate business reason, whether good judgment or not, there are enough disputed facts to leave that to a jury in the first instance.

left his previous position as a CDL trainer due to lack of work, when he was specifically terminated for job abandonment.[4] (Pl.'s Rep. to Def.'s Resp. to Pl.'s PFOF (dkt. 38) ¶¶ 12-17.) For a successful defense of after-acquired evidence, however, defendant must show that the "employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge." *McKennon*, 513 U.S. at 362-363. Plaintiff argues that Hands On would not have fired him for this claimed falsity on his application, making the defense inapplicable.

The standard for an affirmative defense of after-acquired evidence is high. Specifically, the Seventh Circuit has held that "[i]f [the employer] cannot show by a preponderance of the evidence that the after-acquired evidence would have led to [the employee's] termination, it has not made out the defense." *Sheehan v. Donlen Corp.*, 173 F.3d 1039, 1047–48 (7th Cir. 1999). The *Sheehan* case in particular looked at lies on a job application, finding "there was no causation, since it was not disputed that no one in the history of Donlen had ever been fired for falsification of a résumé." *Id.* at 1047. Plaintiff argues that the same principle should apply here because it is undisputed that Hands On has never fired anyone in the past for lying on an application.

Defendant rebuts this argument by citing to a later Seventh Circuit decision, which criticized a district court for "wrongly believ[ing] that defendants could not introduce any evidence about misconduct unless they could show that they had fired another worker for doing exactly what they belatedly learned about [the plaintiff.]" *Cuff v. Trans States*

---

[4] Schmidt argues that his statement was not a true falsehood, as he left his previous job because the company refused to put him in a full-time position. (Pl.'s Opening Br. (dkt. #23) 6-7.)

13

*Holdings, Inc.*, 768 F.3d 605, 609 (7th Cir. 2014). Defendant argues that this statement in *Cuff* constitutes a rejection of any suggestion in *Sheehan* that a company must show it has fired other workers for similar behavior in the past. At least one district court has also read *Cuff* in that way, finding no requirement "that an employer must show that it has, in fact, previously disciplined or terminated an employee for the same misconduct on which it now rests its after-acquired evidence defense." *Mabins v. AEP NVH OPCO, LLC*, No. 16 C 10261, 2018 WL 1397426, at *7 (N.D. Ill. Mar. 20, 2018). Instead, whether the employer has fired an employee for similar conduct is "one factor a jury may consider." *Id*. at *8. While there is uncertainty about the extent to which an employer can successfully mount an after-acquired evidence defense *without* proof of a previously fired employee, therefore, current Seventh Circuit precedent at least makes clear that it is not strictly necessary.

In support of its defense, Hands On further notes that its job application form advises that "providing false or misleading information in my application may result in [employee's] release." (Def.'s Opp.'n (dkt. #27) 8.) However, Hands On also acknowledges that a termination policy alone is not sufficient to prove the defense. (*Id*.); *See also Sheehan*, 173 F.3d at 1048 (holding that defendant failed to meet their burden by showing there was a policy against the conduct "[i]n absence of further evidence that the policy actually would have been applied"). To bolster its claim that the policy would actually have been applied, Hands On notes that Gilbertson actually called Schmidt's former employers. (Def.'s Opp.'n (dkt. #27) 9.) Due to the COVID-19 pandemic, however, Gilbertson did not get a response from either employer he contacted.

14

While defendant argues that Gilbertson's *efforts* to call Schmidt's former employers shows that the policy of termination actually would have been applied, it can be fairly argued that one does not necessarily follow from the other: in particular, willingness to call references has little to do with willingness to terminate employment based on an arguably misleading application. Additionally, despite Gilbertson never hearing back from any of Schmidt's employers, it is undisputed that Hands On continued to employ him anyway. If his previous work experience was so important to Hands On, one could reasonably conclude that the lack of response should have required some additional follow up.

Even more telling is the fact that Schmidt worked for Hands On for a full week before even filling out an application for the company. (Pl.'s Reply to Pl.'s PFOFs (dkt. 38) ¶ 14.) Hands On did not dispute this fact. (*Id.*) Again, a reasonable jury will likely find it difficult to conclude Hands On would have fired Schmidt for an arguable misrepresentation on his application if he wasn't even asked to fill out an application until a week into the job.

Finally, most telling is that at best, the evidence shows Schmidt effectively walked off the job disgruntled with the lack of hours and a refusal by his employer to accommodate the hours he was required to work, *not* evidence of his being fired. Indeed, the employer concluded that Schmidt had effectively quit by job abandonment.

Ultimately, Hands On has the burden to "establish that the wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge." *McKennon*, 513 U.S. at 362–

63. Thus, Hands On will have to persuade a jury that (1) Schmidt's failure to disclose the circumstances of his quitting was misleading, *and* (2) Hands On would have fired Schmidt after hiring him based on that misleading statement alone.  Still, while Hands On after-acquired evidence is underwhelming, there is arguably enough evidence that a reasonable jury *could* find that defendant met that burden; Hands On had a policy against misleading statements on an application; Paul Gilbertson followed up with the previous employers on Schmidt's application; and Gilbertson testified that he would have fired Schmidt had he known the details.  Whether these arguments are believable is now a matter for the jury. As such, partial summary judgment is denied, and should we get to the damages phase of this trial, Hands On will be able to assert this defense to plaintiff's claim for backpay.

ORDER

IT IS ORDERED that:

1) Defendant Hands On's motion for summary judgment (dkt. #15) is DENIED.

2) Plaintiff Ronald Schmidt's motion for partial summary judgment (dkt. #21) is DENIED.

Entered this 4th day of March, 2022.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge